# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE )
)
v. ) I.D. No. 2208005306
)
ELIJA KAMARA, )
)
Defendant. )

Submitted: May 3, 2023
Decided: May 23, 2023

*Upon Defendant Elija Kamara's Expedited Motion for Reverse Amenability*

**DENIED.**

**ORDER**

Dominic Carrera, Esquire, Deputy Attorney General, DEPARTMENT OF JUSTICE, 820 North French Street, Wilmington, DE 19801, Attorney for the State of Delaware.

David J. J. Facciolo, Esquire, MINSTER & FACCIOLO, LLC, 521 N. West Street, Wilmington, DE 19801, Attorney for Defendant Elija Kamara.

**WHARTON, J.**

This 23rd day of May 2023, upon consideration of Defendant Elija Kamara's Expedited Motion for Reverse Amenability, it appears to the Court that:

1.      Defendant Elija Kamara ("Kamara") has been charged by indictment with Attempted Robbery First Degree, Assault First Degree, Possession of a Firearm During the Commission of a Felony ("PFDCF"), and Possession of a Firearm by a Person Prohibited ("PFBPP").[1]  He seeks to transfer these charges to Family Court under 10 *Del. C.* §1011.  A reverse amenability hearing was held on May 3, 2023. Testifying at the hearing for the State were Det. Gino Cevallos ("Det. Cevallos") of the New Castle County Police Department and Family Service Specialist Jonae Smith ("Ms. Smith") of the Department of Services for Children, Youth, & Their Families ("DSCYF"), Division of Youth Rehabilitative Services ("DYRS"), Community Services.  Kamara presented the testimony of Laura Cooney-Koss, Psy.D.; M.C.J. ("Dr. Cooney-Koss").  The Court received reports authored by Ms. Smith and Dr. Cooney-Koss into evidence.

2.      The allegations against Kamara are the result of a chance encounter between the complaining witness ("CW") and Kamara that ended with the sixteen-year-old CW suffering a gunshot wound to his left buttock.[2]  The incident took place on August 7, 2022, in an alleyway behind 7 W. Brandywine Avenue, Claymont,

---

[1] Indictment, D.I. 8.
[2] Unless otherwise stated, the description of the facts supporting the charges come from the hearing testimony of Det. Cevallos.

2

Delaware. Det. Cevallos responded to this shooting incident and made contact with CW in the hospital. CW explained that he and a school acquaintance, whom he identified by his nickname of "Drill Wopo" ran into each other at Hot Dogs and More on the Philadelphia Pike in Claymont. After leaving the store, the two walked around a bit until Drill Wopo tried to steal CW's cell phone. A physical altercation broke out during which Drill Wopo pulled a black handgun out of a Gucci brand fanny pack and shot CW once. CW described Drill Wopo as a black male with short dreadlock style hair, wearing shorts, a black ski mask rolled up on his head as a hat, and a black Gucci brand fanny pack. CW recalled that the suspect's name was "Elija," that he is between 16–17 years-old, and that he was recently arrested for another robbery.[3]

3.      Det. Cevallos obtained surveillance footage from the convenience store which confirmed CW's account. Ultimately, he obtained Kamara's DELJIS mugshot. When Kamara's photo was placed in an array CW immediately positively identified him as his assailant. A search warrant was executed at Kamara's mother's residence and resulted in the recovery of a Gucci fanny pack. Following his arrest, Kamara made unsolicited statements to the effect of, "It was a mistake" and "I didn't mean to shoot him." A preliminary hearing held in the Family Court resulted in a

---

[3] *Id.*

finding that there was probable cause to believe Kamara had committed the charged offenses.[4]

4.     While juvenile crimes are usually handled in Family Court,[5] this Court maintains original jurisdiction over juveniles, aged 16 and older, who commit certain enumerated crimes.[6]  These crimes include, as here, Assault in the First Degree and Attempted Robbery in the First Degree.[7]  Despite having jurisdiction, this Court has the discretion to transfer these charges to Family Court if it finds such a transfer to be in the interest of justice.[8]

5.     Kamara also is charged with PFDCF.  Therefore the provisions of 11 *Del. C.* § 1447A(f) apply.  That section mandates that every person over 16 years of age charged with PFDCF be tried as an adult, "notwithstanding any contrary provisions or statutes governing the Family Court or any other state law" where the Superior Court finds after an evidentiary hearing "proof positive or presumption great that the accused used, displayed or discharged a firearm" during the commission of a violent felony.[9]  At the time of the alleged offenses on August 7, 2022, Kamara whose date of birth is November 9, 2005, was 16 years, 9 months, and 2 days old.  Both Assault First Degree and Attempted Robbery First Degree are

[4] D.I. 1.
[5] *State v. Anderson*, 385 A.2d 738, 739 (Del. Super. Ct. 1978).
[6] *Id.* at 739–40 (citing 10 *Del. C.* §938, redesignated as 10 *Del. C.* §1010 and amended by 69 Laws 1993, ch. 335, §1, eff. July 8, 1994). *See also* 10 *Del. C.* §921.
[7] 10 *Del. C.* §1010(a)(1).
[8] 10 *Del. C.* §1011(b).
[9] 11 *Del. C.* § 1447A(f).

violent felonies.[10]  Therefore, the PFDCF charge must be tried in Superior Court if the Court finds "proof positive or presumption great" that Kamara used, displayed, or discharged a firearm while committing Assault in the First Degree or Attempted Robbery in the First Degree.

6.      Before making a decision where a juvenile's charges should be tried, and upon petition from the juvenile, this Court must hold a reverse amenability hearing and weigh the factors set forth in 10 *Del. C.* §1011(b).  The purpose of this hearing is to place a judicial check on the prosecutorial charging of juveniles.[11] "Since a juvenile charged with a designated felony in the Superior Court has lost the benefit of Family Court adjudication by statutory pronouncement, there is [a] presumption that a need exists for adult discipline and legal restraint. Hence, the burden is upon the juvenile to demonstrate the contrary."[12]

7.      Before addressing § 1011(b)'s factors, "this Court must preliminarily determine whether the State has made out a *prima facie* case against the juvenile[.]"[13]  The Court considers "whether there is a fair likelihood that [the defendant] will be convicted of the crimes charged."[14] Furthermore, "[a] real probability must exist that a reasonable jury could convict the juvenile based on the

---

[10] 11 Del. C. § 4201(c) and (d).
[11] *See State v. Anderson*, 697 A.2d 379, 383 (Del. 1997) (citations omitted).
[12] *Anderson*, 385 A.2d at 740 (citation omitted).
[13] *State v. Harper*, 2014 WL 1303012, at *5 (Del. Super. Ct. March 31, 2014) (citing *Marine v. State*, 624 A.2d 1181, 1185 (Del. 1993)).
[14] *Id.*

totality of the evidence, assuming that the evidence introduced at the [reverse amenability] hearing is unrebutted by the juvenile at trial."[15]

8. Based on the evidence presented at the reverse amenability hearing, the Court finds that there is a real probability that a reasonable jury could find Kamara guilty of all charges. CW knows Kamara from school, provided law enforcement with important details, and was able to identify Kamara. CW's statements coupled with Kamara's unsolicited incriminating post-arrest statements and the recovery of the Gucci fanny pack at his mother's home constitute sufficient evidence to conclude that there is a real probability that a reasonable jury would arrive at a guilty verdict. For the same reasons, the Court finds "proof positive and presumption great that Kamara used, displayed, or discharged a firearm during the commission of the violent felonies of Assault First Degree and Attempted Robbery First Degree.

9. The first factor under § 1011(b) is the nature of the present offense and the extent and nature of the defendant's prior record. This factor is two-pronged.[16] Here, all charges are violent, serious, and demonstrate a concerning escalation in antisocial behavior. As summarized below, Kamara has previous violent adjudications. Kamara's initial involvement with DSCYF dates back to his

---

[15] *Id.* (citation omitted).
[16] *See* 10 *Del. C.* §1011(b)(1).

November 8, 2021 arrest.[17] At that time, he was charged with Robbery in the First Degree, PFDCF, Possession of a Firearm by a Prohibited Juvenile, Reckless Endangering in the First Degree, and Conspiracy in the Second Degree.[18] Kamara, along with others, was accused of robbing the victim at gun point and assaulting him.[19] He was adjudicated delinquent on one count of Robbery in the First Degree.[20]

10. Following his return to the community after the robbery adjudication, on April 18, 2022, Kamara resolved charges from two cases pending in Pennsylvania.[21] The charges in the first case were Aggravated Assault, Simple Assault, Harassment, Terroristic Threatening, Resisting Arrest, and Disorderly Conduct.[22] In the second, they were Prohibited Offensive Weapon, Possession Instruments of Crime, Simple Assault, Reckless Endangering, and Harassment.[23] In one incident, and possibly in response to a feud, Kamara (with 5–6 others) "allegedly went to the victim['s] home and pointed what appeared to be a gun at him, and then ran away."[24] In the other, Kamara allegedly "resisted officer directives and was

---

[17] Jonae Smith's Reverse Amenability Report (prepared February 7, 2023) at 1 ("RA Report"). The report was admitted into evidence at the reverse amenability hearing as a State's Exhibit 1.
[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] *Id.* at 3.
[22] *Id.*
[23] *Id.*
[24] *Id.*

taken into custody."[25] He was adjudicated delinquent of Simple Assault, Resisting Arrest, Possession of a Weapon, and Simple Assault, apparently all misdemeanors.[26]

11.     Kamara also has a history of violent behavior while detained.  For example, on November 28, 2021, while at an unsecured Residential Alternative to Detention placement, Kamara was arrested and charged with Harassment, Assault in the Third Degree, and Conspiracy in the Third Degree related to his "involve[ment] in an assault on another peer."[27]

12.     Kamara is currently charged with Attempted Robbery in the First Degree, Assault in the First Degree, PFDCF, and PFBPP.[28]  Looking at Kamara's record, he has demonstrated a clear affinity for firearms.  Of particular concern is the fact that Kamara has shown himself willing and able to wield firearms irrespective of who he is with; both within a group setting and when alone with a prospective victim.  At the same time, Kamara's behavior demonstrates a clear escalating pattern from "merely" flashing a firearm to actually shooting a victim.  This first factor weighs heavily against transfer.

13.     The second factor under § 1011(b) is the nature of past treatment and the defendant's response.  It appears Kamara's response to treatment appears mixed at best.  Kamara received a psychological evaluation on March 16, 2022 by Dr.

---

[25] *Id.* The alleged victim in that case has since recanted. *Id.*
[26] *Id.* at 3.
[27] *Id.* at 1.
[28] Indictment, D.I. 8.

Benjamin Lungen of the Division of Prevention and Behavior Health Services of DSCYF.[29] He was diagnosed with Other Specified Bipolar Related Disorder, Post-traumatic Stress Disorder, Generalized Anxiety Disorder, and Conduct Disorder Adolescent Onset Type.[30] Dr. Cooney-Koss believes Kamara meets the diagnostic criteria for Bipolar I Disorder, Other Specified Trauma and Stressor – Related Disorder, Cannabis Use Disorder, moderate, in early remission due to being in a controlled environment, and Conduct Disorder, severe, with limited prosocial emotions.[31]

14.     Recommendations from Dr. Lungen included outpatient counselling with a therapist well versed in Trauma-Focused Cognitive Behavior Therapy, psychiatric monitoring of his medication, and engaging with a school social worker to help monitor ADHD symptoms.[32] While at Snowden Cottage, Kamara "struggled and often challenged staff directives," remaining at the lowest behavior level until just before his discharge, but still completed his community service hours.[33] Following his release to the community on April 1, 2022, Kamara initially did well – he adjusted to being at home, obtained employment, attended school, remained engaged with the Youth Advocate Program ("YAP"), and followed curfew.[34] On

---

[29] RA Report at 2.
[30] *Id.*
[31] Cooney-Koss Report at 16-17.
[32] RA Report at 2.
[33] *Id.*
[34] *Id.* at 3.

June 30, 2022, Kamara's GPS was removed because he was doing well on aftercare.[35] Unfortunately, this period of good behavior was short lived because Kamara was arrested on August 30th for the August 7th incident.[36]

15. It appears Kamara has been detained in secured detention three times.[37] He was placed in Vision Quest, a non-secure detention facility on one occasion, but was removed for assaulting a peer.[38] He successfully completed a Level IV program, The Cottages, following his adjudication for Robbery in the First Degree.[39] Despite being provided with community based services by DYRS, including YAP, GPS monitoring, and the Vision Quest Accountability Program Kamara was arrested for the present serious charges only four months after being released to the community.

16. It is unclear how much of the recommended treatment Kamara was afforded. Nonetheless, he has been provided with substantial services by DSCYF. The results, while at times encouraging, ultimately have been disappointing. This factor also weighs against transfer, although less strongly than the first.

17. The third factor under § 1011(b) is whether the interests of society and Kamara would be better served by a trial in the Family Court or in the Superior Court. This factor strongly supports the Superior Court retaining jurisdiction. In weighing this factor, the Court has taken a number of considerations it considers

---

[35] *Id.*
[36] *Id.*
[37] *Id.* at 5.
[38] *Id.*
[39] *Id.*

relevant into account. Kamara is now over 17 and ½ years old and will be even older before a trial in Family Court could occur. Since DYRS can only provide services to him until age 19, it will be able to provide services for less than 1 ½ years. Even that estimate may be overly generous considering that the pending adult charge of PFDCF will remain in Superior Court and make efforts to provide services through DYRS challenging.

18. Dr. Cooney-Koss recognized that given the limited time available to it and Kamara's extensive needs, DYRS could not complete rehabilitation prior to Kamara's transfer to adult supervision. Although she could not offer an opinion that Kamara was amenable to DRYS services, she did recommend that the Court consider bifurcating his case so that he could receive mental health counselling within the Family Court, followed by adult supervision.[40] However, it makes little sense to the Court from litigation and judicial economy perspectives to try a charge of PFDCF in one court while trying the felonies Kamara is charged with committing with that firearm in another.

19. Of significance to the Court in assessing in what court the needs of society would be better met are the results of the Risk-Sophistication-Treatment Inventory ("RSTI") reported by Dr. Cooney-Koss.[41] One of the purposes of the

---

[40] Dr. Cooney-Koss Report at 18.
[41] *Id.* at 13-15.

11

RSTI is to help determine the appropriateness of transferring juveniles from adult court to juvenile court.[42]  It weighs heavily against transfer to Family Court.

20.    In the category of Risk for Dangerousness, Kamara scored in the 93rd percentile of other juvenile offenders, meaning only 7% of other juvenile offenders would be more dangerous than he.[43]  In the subcategory of Violent and Aggressive Tendencies, he scored in the High Offender category, meaning he is worse than other youthful offenders with regard to a history of violent conduct.  In the subcategories of Planned and Extensive Criminality and Psychopathic Features, Kamara again scored in the High Offender category.

21.    In the Sophistication-Maturity category, Kamara scored in the 91st percentile of juvenile offenders, meaning that he is more independent and uses his cognitive skills and abilities for criminal purposes and his criminological lifestyle has become more ingrained than 91% of other juvenile offenders.[44]   He scored in the High Offender Range in the areas of Autonomy and Cognitive Capacities and in the Middle Offender Range in the area of Emotional Maturity.[45]

22.    As for the Criminal Sophistication category, Kamara scored 7 out of 15 points, indicating that he tends to use the traits he has to further his criminal conduct and/or has a recognition why his behavior is problematic, but does it anyway.[46]  Dr.

---

[42] *Id.* at 14.
[43] *Id.*
[44] *Id.*
[45] *Id.* at 14-15.
[46] *Id.* at 15.

Cooney-Koss notes that Kamara would have had a higher score, but his lack of emotional maturity prevented him from scoring higher.[47] Kamara's scored in the 46th percentile in the Treatment Amenability category, placing him in the Middle Offenders Range, meaning he is more amenable to treatment than 46% of other offenders.[48] He placed in the Middle Offender Range in the areas of Degree and Type of Psychopathology and Consideration for Others, while placing in the High Offender Range in the area of Responsibility and motivation to Change.[49]

23. Kamara might benefit marginally by some of the charges remaining in Family Court to the extent that court is able to initiate rehabilitative efforts before he is transferred to adult supervision. However, the Court finds that benefit to be modest when compared to the societal benefit of the charges remaining in Superior Court.

24. Accordingly, the Court finds that Kamara has failed to meet his burden of demonstrating that his charges should be resolved in Family Court.

**THEREFORE,** Defendant Elija Kamara's Expedited Motion for Reverse Amenability **DENIED**.

/s/ *Ferris W. Wharton*
Ferris W. Wharton, J.

---

[47] *Id.*
[48] *Id.*
[49] *Id.*